

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROBERT WARREN,

    Petitioner,

v.

GUY PIERCE, Warden,
  Pontiac Correctional Center,

    Respondent.

No. 05 C 3368
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Robert Warren is serving a sentence of fifty-two years after being found guilty of committing first-degree murder. He appealed his conviction on several grounds and is still following the usual path of post-conviction review of the state courts. Some of those challenges have already been denied and most of his appeals have been exhausted. He now seeks the writ of habeas corpus.

## FACTS

The Appellate Court found and recited the basic facts:

> On May 29, 1995, defendant called 911 to report that he had witnessed an attack between two men. Officer Frankie Garcia [responded] to the call [and] encountered defendant at the Redwood Inn in Elgin. Defendant told Garcia that, as he was walking on a bike trail behind the post office on his way to the store to buy some cigarettes, he saw two men wrestling . . . one subject . . . an Hispanic male, about 5'2" . . . wearing black pants and a white T-shirt. He was trying to push an elderly subject into the Fox River. Defendant yelled at the Hispanic to stop. The Hispanic started to run southbound and defendant chased after him. Defendant lost sight of the Hispanic and went to the Redwood Inn to telephone the police. . . . Garcia called in his report [and] was told to bring defendant [in] to talk with investigating officers.

Garcia asked defendant to come to the station and defendant agreed. They arrived at the station sometime after midnight.

Detective Lullo [went to the scene and] found the victim's body in the Fox River. He [saw] that the body's trouser pants pocket had been pulled inside out. He saw some papers about 10 feet from the body. The victim had severe gashes throughout the neck area. Lullo found a trail of blood from the grassy area near the post office wall continuing across the bicycle path toward the river. Lullo was informed that a witness to the incident was waiting at the police station.

Lullo returned to the police station around 1 a.m. to question defendant in the report writing room. Defendant told [Lullo] that he was sleeping in a garage . . . woke up [and] attempted [unsuccessfully] to wake his friend, Tom Murow, to borrow a cigarette . . . [then] he went to buy some [at about] 11:45 p.m.

As defendant was walking southbound down a bike path, he saw two men fighting. [He] described one man as a short Hispanic wearing a white T-shirt and black shorts. The other was an older man about six feet tall. Defendant yelled and swore at the men but no one reacted. Defendant walked a few feet closer, stopped, and yelled again. Both men looked at defendant. At that point, defendant told Lullo that the Hispanic let go of the older man, who fell onto the bicycle path. Defendant then chased the Hispanic. When he lost sight of the Hispanic, [he] went to the Redwood Inn and called 911.

Lullo noticed several inconsistencies in Defendant's account . . . the fact that the victim's body was found in the river, not on the bicycle path . . . [the fact that there appeared to be] a fresh grass stain on defendant's jeans and what looked like blood on his shoes [despite having told Lullo] that he never came near the victim. Lullo also wondered why defendant never went back to check on the victim.

The interview ended and defendant was . . . moved to the major investigative division waiting room, while Lullo ran a criminal background check on defendant and questioned . . . Tom Murow, in an attempt to verify defendant's account and to establish defendant's credibility. Lullo testified that after he interviewed Murow, he found Defendant asleep on the couch.

Murow refuted defendant's story. He told Lullo that he had been wide awake because of a fight over a blanket and he had asked defendant to get him some pop. Contrary to defendant's account, Murow had no cigarettes and had to borrow six from the

defendant. According to Murow, defendant left the area around 10
p.m. After this interview, Lullo decided to treat defendant as a
suspect.

Lullo and another detective, Greg Welter, entered the major
investigative division waiting room around 3:00 a.m. and asked
defendant if he would give them his clothes for evidence.
Defendant agreed, removed his clothes, and put on a paper
jumpsuit. Among defendant's personal items [was] $15.38.

After defendant gave the police his clothes, Lullo read
Defendant his Miranda rights. Defendant was then questioned
some more and around 4:50 a.m., defendant agreed to tape record a
statement [which] reiterated his account of the confrontation he
had witnessed between the Hispanic and the victim.

Lullo then asked defendant to provide a blood sample at the
hospital. After he gave the blood sample, defendant refused to
answer any more question and asked for a lawyer. [On advice of a
prosecutor,] the police . . . let defendant go and defendant left the
station around 6 a.m. About two weeks later, on June 16, 1995,
Lullo arrested Defendant.

A jury eventually convicted Warren of first-degree murder.

## PROCEDURAL HISTORY

After his conviction, Warren appealed several of the trial court's rulings. In particular, he challenged the sufficiency of the evidence presented against him, the constitutional admissibility of his statements to the police, the use of "mere fact" impeachment by prior conviction, and the admission of other evidence obtained by the police.

The Appellate Court concluded that Warren was not in custody (and therefore not subject to *Miranda* rules) during his initial interview, when "he was told twice that he was not under arrest . . . [t]he report writing room was unlocked from the inside [and] defendant used the washroom unescorted and returned voluntarily to the report writing room, when he simply could have walked out the front door of the station." Even the move to the investigative division waiting room for a short period of time did not create custody, because he was put into an

3

unlocked room and not restrained in any way.[1] Warren stated that he had voluntarily surrendered his clothes because he thought that if he had not done so, he would have suffered some adverse consequences. As a result, the Appellate Court concluded that there was no basis to suppress the physical evidence taken from Warren.

During the appeal, the statement given after warnings was also attacked, on the grounds that Warren was incapable of understanding the warnings. A clinical psychologist testified to this, and also opined that Warren was not competent to stand trial or understand the warnings because of his low language comprehension and personality disorder problems. Warren later seemed offended by the report and sought to show how much he had learned about courts and law since he had been in jail. The prosecution expert (whose credentials were unchallenged) interviewed Warren twice and found no sign of mental illness or inability to comprehend the warnings.

With regards to the statements, Warren himself testified that he was 27 years old, had been a ward of the state since age 5, had trouble learning things and had only completed up to the 10th grade in special education. In addition, he had been admitted to mental institutions between 20 and 30 times. He knew what *Miranda* warnings were because he recognized the words from television and had studied his own case, including memorizing the actual warnings. He remembered going to the police station, but did not remember the police giving him the warnings. The Appellate Court affirmed the trial court's decision to admit the statement because the trial judge had considered the evidence and was entitled to rely on his own observations of Defendant's testimony.

---

[1] The room was furnished with a couch, which Warren apparently fell asleep on.

When considering the sufficiency of the evidence against Warren, the Appellate Court noted that the victim, whom the police pulled from the river, was George Robotham, a 70 year old homeless man who used a four-pronged cane. The victim's wife gave evidence that the victim carried a wallet, but he was found with his pockets turned out and the police did not recover a wallet from the scene. However, they did find three envelopes and a train schedule on the ground nearby. The police found Warren's prints on one of those envelopes, as well as a drop of blood on Warren's boot that matched the victim's blood type. In addition, investigators found three rubber caps near the scene which all fit the four-pronged cane they recovered from the bottom of the river.

The pathologists discovered 24 wounds on the corpse. Those wounds included some bruises which were caused by a blunt instrument about the width of the victim's cane, and some stab-like wounds, which also could have been produced by the cane. The wounds did not break any arteries or veins, so even if they caused some blood to leak out, it would not have pumped out or spattered. Although some of the injuries might have been lethal, the victim actually died from drowning.

Casey Swindle, an inmate at the same correctional facility that Warren was placed in, testified that while they were in jail Warren had asked him if fingerprints could be found on a cane thrown in the river and the papers he took from the victim's pocket. According to Swindle, Warren also confessed to the crime.[2] Swindle made a deal that, in exchange for his testimony,

---

[2]Swindle claims that Warren mentioned that he had been staying in an abandoned garage when someone accused him of stealing a blanket, which made him angry. Warren then walked down to the path where he saw Robotham, a man he knew from the Wayside Mission. Warren jumped out and demanded money twice, but Robotham refused to give any money to a "thieving bum." Warren then pushed George to the ground, grabbed his cane and started beating his chest

5

his attempted armed robbery charge would be dismissed and he would only receive a three year sentence for burglary. Another inmate witness testified that Warren pointed a finger at an inmate and said he was going to kill that inmate "just like that old man." That witness accepted a deal for a ten year sentence in a residential burglary in return for testifying.

Warren testified in his own defense during the trial. He said he was homeless but knew the victim from the Wayside Mission where, a week before his death, Robotham had shown him a paper and asked what he thought about it (thus explaining the fingerprint). The night of the attack, Warren said he had been kicked out of his girlfriend's apartment and spent the night in an abandoned garage stall. He wanted to borrow money for rent. He then reiterated the same story he told the police. His defense also emphasized the lack of blood on his person.[3] In front of the Appellate Court, Warren claimed that, in light of the evidence he had presented, the evidence against him was insufficient to support a conviction. The Court disagreed and ruled that the evidence was sufficient.

The final issue on appeal was the use of the "mere fact" method of impeachment, where the jury is advised that the Defendant has been convicted of a felony, but is not told the nature of the felony. The Appellate Court ruled that the trial court's decision could not be challenged

---

and neck with it. The blood got on his shoes because when he saw that George was still breathing he tried to throw him into the river. Afterwards, Warren called 911, figuring that if he reported the incident the officers would leave him alone. He said that he stole a total of six dollars from Robotham.

[3]The defense has a good point about the small amount of blood on Warren, which could be explained by him coming to the assistance of the victim. However, the Appellate Court noted that the blood stains found only on the top of the victim's shirt (but not on any lower portion of clothing) are consistent with the victim being beaten while on the ground, as opposed to Warren's version that the real perpetrator attacked Robotham while standing.

because Warren had asked for it. Warren sought to have all of his prior convictions excluded, or in the alternative, requested that the jury only be told that he had been convicted of a felony offense. He won the alternative relief. Moreover, he had the opportunity to tell the jury the nature of the offense but chose not to do so.

In September, 2000, after the appellate court affirmed his conviction, Warren sought a rehearing and filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court. In addition, in October, 2000, he filed a separate petition for post-conviction relief ("PCR") in the Circuit Court, attacking Swindle's testimony and attacking the prosecution for both concealing Swindle's criminal history and knowingly offering false testimony. The PCR petition also raised a state law challenge concerning the inconsistency between the indictment and the final judgment of conviction. The court appointed counsel for Warren, but the matter was still pending as of July, 2005. In October, 2004, Warren filed this petition alleging all of the same grounds as the PLA, and also adding an allegation that the failure of the Illinois Supreme Court to rule upon his PLA was a denial of due process. In February, 2005, the Illinois Supreme Court finally dismissed the PLA because Warren had failed to exhaust all of his state court remedies – the PCR was still pending in the Circuit Court. Four years is certainly a long time to wait for a decision, but the Illinois Supreme Court eventually denied the petition, thus there is no remedy for Warren.[4] *Allen v. Duckworth*, 6 F.3d 458 (7th Cir. 1993).

---

[4]Even assuming the law would permit me to order the Supreme Court to rule by a certain date, it has already done so. If it turns out that there is no constitutional error in the judgment against Warren, then the delay in ruling has done him no harm. If there is a constitutional error, then I would, effectively, vacate his conviction, which would give him the relief he sought from Springfield. In *theory* he could make a damage claim against the Illinois Supreme Court, but the Justices are immune, so no claim could actually go forward.

The grounds Warren raised in the PLA are clearly exhausted, but the grounds included in the PCR proceeding are not. He has stated that he wishes to proceed with this petition even though he understands that this is his one and only chance to seek federal *habeas corpus*. If he loses the pending petition in state court he will not be able to seek federal *habeas corpus* on those grounds. Warren asked to proceed and, with his request, filed an affidavit stating "I forever give up my right to bring the pending issues in the circuit court of Kane County, under case no. 95 CF 1275, in the post-convictions to a federal review." Based upon this waiver, I ordered a response which has, along with state court records, been filed. I will only address the exhausted claims.

## ANALYSIS

The evidence against Warren was clearly sufficient to support a conviction under *Jackson v. Virginia*, 443 U.S. 307 (1979). The physical evidence, Warren's presence at the scene and his story, which was both contradicted by Murow and inconsistent with much of what was found at the scene, all support his conviction. In addition, Warren chose to testify at trial, so the jury could have found that he was lying and considered his lies to be a demonstration of consciousness of his guilt. Combined together, all of those facts are sufficient when following the rule in *Jackson*. Lastly, the jury was entitled to believe the testimony of Swindle and the other inmate. When that information is combined with the rest of the evidence, it also supports the conviction. It is possible that a jury could have believed Warren's testimony and acquitted him, but, based on these facts, the jury was not required by the Constitution to do so.

The use of Warren's prior convictions is also a losing argument for many reasons. First, he waived that argument in the state court, therefore it is still unavailable here. Second, even if it was not waived, there is no prejudice shown. Warren does not even bother to argue that he

8

would have been better off if the jury had known about his prior conviction for robbery. Third, the use of prior convictions for impeachment is constitutional and expressly authorized by the Federal Rules of Evidence promulgated by the Supreme Court of the United States and approved by Congress. *See also Spencer v. Texas*, 385 U.S. 554 (1967). For many years, the federal courts have sustained state court determinations as to the admissibility of prior crimes as largely, if not entirely, beyond the ambit of constitutional limitations. *See, e.g., Murphy v. Beto*, 416 F.2d 98 (5th Cir. 1969); *United States ex rel. Clawson v. Rundle*, 396 F.2d 778 (3rd Cir. 1968). This was the law even before Congress limited federal relief to cases in which the state court decision is contrary to, or an unreasonable application of, United States Supreme Court precedent. There is no precedent barring the use of "mere fact" proof of prior conviction for impeachment.

Warren's attack on the use of evidence acquired in the police station is also denied. *Stone v. Powell*, 428 U.S. 465 (1976), requires deference to state court determinations, after the state provides a full and fair opportunity to present the claim. Warren claims he did not have such an opportunity, but does not identify anything to support his claim. He seized upon one line in the respondent's brief which says he was arrested on suspicion of murder, and then characterized this as an admission that he was under arrest. However, that is not what the state court determined, and the state court's findings control. The Court carefully and fully reviewed Warren's Fourth Amendment contentions, and the decision of the Appellate Court falls squarely within the ambit of *Stone*.[5] Even if I were not limited in my review of the merits of the determination, I would

---

[5]Earlier in this case, Warren asked for the production of various items – police reports and similar documents – that were never part of the record in this case. Only the documents which were in the record must be produced. Warren apparently believes that he can retry the motions he lost in the trial court, but he may not. The time to make arguments and offer evidence was in state court, not here. That is the point of *Stone*.

9

still decline relief. The Appellate Court opinion was sensible and consistent with Supreme Court precedent. It was, in a word, correct.

The *Miranda* claim was well-defined both at trial and on appeal. Warnings were given, waiver was obtained, and the only grounds to challenge admissibility was the ability of Warren to understand the warnings and offer a waiver. The state courts understood that this was a mental capacity challenge to a waiver and analyzed it according to the requirements of the Supreme Court. *See, e.g., Colorado v. Connelly*, 479 U.S. 157 (1986). The trial court heard conflicting evidence concerning Warren's mental capacity to confess, and there was plenty of evidence to justify a finding that he understood what he was doing. The Appellate Court carefully reviewed the finding of the trial judge, and there is no room for federal review here. *Marshall v. Lonberger*, 459 U.S. 422 (1983). The state courts made reasonable findings of fact and applied the correct legal standard. There is no constitutional error here.

The claim about inadmissible evidence is essentially an assertion that Warren's statements, the fact of the prior conviction, and some physical evidence should not have been admitted. All of these constituent claims failed individually, and so does the combination of them.

The petition for writ of habeas corpus is denied.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: September 28, 2006